UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 09-10017-GAO |
| | ) | |
| | ) | |
| TAREK MEHANNA | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

**I.     Introduction**

In February 2004, Tarek Mehanna traveled to Yemen in search of a terrorist training camp so he could learn to kill American soldiers. His plan to murder American soldiers was thwarted not by capture or a change of heart but only by his failure to find suitable training. When he returned to America he did not abandon that plan; rather, he continued to explore traveling overseas to obtain the training that he desired. He also looked for other ways to carry out his lethal intentions by recruiting others to do what he had failed to do, namely, to fight and kill. Acting as *al Qa'ida's* "media wing," he edited and translated *al Qa'ida* recruitment materials that are widely considered to be among the most effective propaganda of their kind. Those inspirational materials (which are still available on the internet) pose a deadly danger in an era when internet recruitment and radicalization have become a prevalent path to violent extremism.

In contrast to many terrorists, including some of his co-conspirators, Mehanna has never disavowed his violent extremist views or expressed any remorse for his crimes. On the contrary, just as he lied to the airport officials and FBI agents who questioned him about his trip to Yemen, he offered a defense at trial of innocent purpose that was manifestly untrue and that the jury rejected. Mehanna's longstanding commitment to the cause of terrorism and *al Qa'ida*, his agreement to

1

provide terrorists with material support and to kill overseas, and his complete lack of remorse, suggest that he remains a clear and present danger to society.

Mehanna's crimes of conspiring to kill Americans and providing support to this country's enemies are among the most serious a person can commit. He had been involved in that enterprise for years before the government learned of his intentions. The need for punishment, along with the need to prevent him from reoffending and to deter others, require a substantial prison sentence. The Sentencing Guidelines call for a life sentence and Mehanna's crimes – which were intended to influence and retaliate against governmental conduct – require lengthy incarceration.

## II. Nature and Circumstance of the Offenses and the History and Characteristics of the Defendant

**A. Nature and circumstances of the offenses.** Mehanna's most serious offense was conspiring to kill. His lengthy efforts to achieve that goal (lasting nearly a decade) demonstrate his resolve to succeed. (A full account of Mehanna's criminal conduct is set forth in the Government's Statement of Relevant Facts, which is attached to this memorandum as Attachment "A.") Shortly after Usama bin Laden and his associates killed thousands of Americans on September 11, 2001, Mehanna and his co-conspirators agreed to explore ways in which they, too, could kill Americans. Their first attempts in 2002 to gain entry into Afghanistan via Pakistan failed. After the U.S. invasion of Iraq, they considered plans for attacking Americans at home, but ultimately dismissed them as impractical. Instead, they focused on ways to kill American soldiers – whom they called "infidels" – on the battlefield. They discussed many options. They decided to seek training in Yemen, sought guidance on how to obtain it, received contacts, equipped and readied themselves for the journey, and made arrangements to sneak out of Massachusetts. Once in Yemen, they spent days criss-crossing the hostile landscape in search of a suitable training camp, braving brigands and

once facing down an AK-47. They were deterred by nothing except for their ultimate inability to find a suitable training camp.

Mehanna returned to the United States disappointed but no less determined to provide support to America's enemies. He agreed with other conspirators in England, Canada and the United States to provide *al Qa'ida* with the means of reaching and recruiting others. Mehanna knew the power of visual media to radicalize because it had worked on him. As he described to his potential bride in the fall of 2006,

> I started practicing in the summer of 2000. ... I was always politically-minded, so I always felt a sense of connection to the *Ummah* and hatred for what was being done to it, even though I wasn't fully practicing Islam myself. Then, one day in Ramadan 1999, a friend of mine showed me a video from Shishan [Chechnya] that he had obtained from a brother who had strove there. This pointed me in the right direction.

[Trial Exhibit 778A]. Mehanna translated, edited and disseminated materials created by and for *al Qa'ida*, at times bearing the *al Qa'ida* name and symbols. In some cases he was specifically asked to translate and edit materials on behalf of *al Qa'ida*. During several chats that were saved on his computer, Mehanna and his coconspirators voiced their hope that the media projects they were creating and distributing would "make[] an impact" and "lead[] to action," and that the efforts of the "media wing" would lead to an "armed wing." [Trial Exhibits 523, 536 and 503].

The nature of Mehanna's crimes highlights his dangerousness and the resulting need to separate him from society. Unlike some terrorists, who act mainly on their own and attempt a single terrorist act, Mehanna envisioned himself as a leader who could explain to others *why* terrorism was called for, and he acted accordingly. He not only tried to provide himself to terrorist organizations to kill American soldiers, but aided and encouraged others to do so in a principled way as well. He was charismatic, knowledgeable and strident -- which helped him radicalize individuals locally and throughout the country. For example, years after his own trip to Yemen, he told one of the younger

men he was bringing along that it would be good to go back together to "donate blood," that is, to fight and die. [Trial Exhibit 617]. And he tried to recruit terrorists around the world by administering violent extremist message boards and distributing the recruitment materials he created for *al Qa'ida*. Those materials – especially *39 Ways to Serve and Participate in Jihad* and *the Expedition of Umar Hadid* – remain hugely influential; they have been found in the possession of numerous other defendants convicted of terrorism-related charges around the world. [*See* Attachments "B" and "C" (Congressional Testimony discussing the significance of terrorists' use of the internet and of Mehanna's translation of *39 Ways to Serve and Participate in Jihad*).][1] Although Mehanna's efforts to support terrorists and carry out terrorist acts may be less spectacular than those of some other convicted terrorists, they will likely prove just as effective.

In addition to conspiring to kill and to provide material support to terrorists and *al Qa'ida*, Mehanna has done his utmost to obstruct the FBI, starting with the investigations into the activities for which he has been convicted. Each time Mehanna was questioned by law enforcement during the time period of the conspiracy he chose to lie and mislead. When he returned from Yemen in February 2004, for example, he told border officials that his traveling partner (*i.e.* Abousamra) was still in Yemen. He made this statement even though he and Abousamra had left Yemen together and

---

1   *See* Attachment A at 14-15. In some cases, the defendant's translations were specifically consulted just before terrorist activities. First, Sohail Qureshi, who was arrested en route to Afghanistan to fight NATO forces there, had specifically requested *39 Ways to Serve and Participate in Jihad* days before his trip. The defendant had corresponded with Qureshi days before on Tibyan Publications. [Trial Exhibit (Marked for Identification only) 389]. Qureshi's image, apparently doctored to conceal his identity, was also found on Mehanna's computer. [Trial Exhibit 175]. Second, the defendant translated a document called Such are the Messengers Tested by Abu Musab al Zarqawi. [Trial Exhibit 248.] According to Keith Verrals of New Scotland Yard, "In the early hours of 21st July 2005 the '21/7 cell' were at the apartment that they used as a 'bomb-making factory' completing their final preparations, when a downloaded copy of "Such are the Messengers Tested" was viewed on a CD on their computer (this was proved by the record of activity on the computer and was not disputed by the defence at trial – the CD & computer were recovered & attributed to them). A few hours later in the morning they left the apartment with IEDs in rucksacks, intending to kill themselves & dozens of innocent civilians."

he knew Abousamra was on his way to (or already in) Iraq.  Mehanna could have said "I don't know," which would also have been a lie, but would not have misled the officers and agent.  Mehanna's intention was to support Abousamra's continuing efforts to go to Iraq to kill Americans, even though he (Mehanna) had decided to return to the United States.  Similarly, when Mehanna was questioned by the FBI about Daniel Maldonado's location and activities, he could simply have refused to answer the agent's questions; instead, he tried to advance Maldonado's mission by falsely stating that Maldonado was in Egypt working for a website, when he knew that Maldonado was in fact training and fighting in Somalia.

      **B.  Characteristics of the defendant**.  Mehanna lived a double life.  To his family and community, he was a dutiful and scholarly young man, but to his close friends and online contacts, he was a proponent of violence as a means of achieving political goals.  The evidence at trial proved that Mehanna's true self bears little resemblance to the image he has adopted in an apparent effort to gain public support.  Two months of evidence provided extraordinary insight into the defendant's mind.  It showed that he is an angry, callous and calculating man who obsessed about violence against Americans for most of his adult life.  He traveled overseas in order to take up arms against his own country and helped others do the same.  He conspired to kill American soldiers, engaged in numerous acts to help kill them, and prevented the government from learning about those who shared his criminal goals.  He also created and distributed the most important types of tools currently used by *al Qa'ida* and other terrorists to recruit others to travel to areas of conflict and kill Americans.

      Mehanna left no doubt that the purpose of his activities was to help those who were killing American soldiers: "That's one way to reduce troop levels," he once said referencing a video where U.S. military forces were killed by an exploding IED.  He often discussed and delighted in the receipt of the latest speech or video from *al Qa'ida* leaders.  He thought of Usama bin Laden as his "real

father." [Trial Exhibit 623]. He expressed glee at the death of Americans at the hands of Muslims, encouraging others to watch them being killed with phrases like, "dude .... I saw the coolest blood donation clip today ... I want u to see it." [Trial Exhibit 627]. The photo of Mehanna grinning from ear to ear at the site of the World Trade Center with a finger outstretched captures the essence of his thoughts as he carried out the crimes of conviction. [Trial Exhibit 354C].

The evidence also revealed the types of imagery that the defendant enjoyed viewing and in which he immersed himself. They include the beheading of Nick Berg, a contractor from Pennsylvania, who was kidnapped and beheaded in approximately May 2004. (One of Mehanna's heroes, Abu Musab al-Zarqawi was given "credit" for killing Berg.) Several other beheadings are depicted in videos found on Mehanna's computer. Still other links show that he distributed the video depicting the beheading of Wall Street Journal reporter Daniel Pearl in Pakistan and cited to the justification for American contractor Paul Johnson's beheading in Saudi Arabia. When describing "movie night" with his friends, he thought some movies might better be characterized as "heads off." [Trial Exhibit 657].

Mehanna and his co-conspirators frequently joked about such killings and other attacks on Americans. For example, he prolifically distributed a video of the mutilation of American soldiers in Iraq, described how one could see the internal organs and ribs, and then said, "Texas BBQ is the way to go." [Trial Exhibit 734]. He discussed another mutilation video that he dubbed the "Hanes" video because the dead American soldier's underwear tag is visible in the video. [Trial Exhibit 728].

Statements Mehanna made on Tibyan Publications, a violent extremist internet forum that he moderated, show that his interest in these videos was not just childish or prurient. In a posting on Tibyan Publications in 2005, for example, Mehanna expressed the view that anyone who supports the war effort against Muslims should be a target of violence. In other posts he acknowledged that

he once supported the view that all Americans, regardless of their status or location, were to be targeted, but that he had since "moderated" his views and now only supported targeting those involved in the war effort. [Trial Exhibits 419 and 420]. He ridiculed Muslim advocacy organizations that encouraged less-violent responses to American actions overseas. For example, of the then-head of the Muslim American Society, Mehanna said someone needed to "hang him by the testicles and beat him with a broomstick[]" and "I want to personally cut off Mahdi Brey's balls." [Trial Exhibits 685 and 605]. Of another community leader who suggested standing up to extremism, he suggested that she "be raped with a broomstick." [Trial Exhibit 603]. He did not support anti-war demonstrations because he believed "RPGS [rocket propelled grenades] speak louder than words." [Trial Exhibits 420 and 712].

The videos of graphic violence and Mehanna's comments about them, along with his statements on Tibyan Publications, are symptomatic of his coldhearted ruthlessness shown at trial -- completely at odds with the image of Mehanna as a thoughtful opponent of so-called American imperialism. They are signs of a deep and principled hatred for America and a willingness to shed blood to achieve political ends.

Mehanna has never indicated a withdrawal from the conspiracies alleged in the indictment, and he has remained recalcitrant to acknowledge any aspect of the wrongfulness of any of his activities over this time.

   **C.   Need for specific deterrence and to incapacitate the defendant**. Individuals who commit terrorism-related crimes are not lightly deterred. Those who commit crimes of terrorism are more likely to repeat terrorist crimes. *See United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (*citing United States v. Meskini*, 319 F.3d 33, 92 (2nd Cir. 2003) ("[Terrorists, even those] with no prior criminal behavior[,] are unique among criminals in the likelihood of recidivism, the

difficulty of rehabilitation, and the need for incapacitation.")). That is especially true of those, like Mehanna, who fail to acknowledge the wrongfulness of their conduct. The extraordinary likelihood of recidivism is one rationale for the increase in offense level and Criminal History Category called for by the terrorism enhancement in USSG §3A1.4. Mehanna's long dedication to the cause of terrorism, his repeated efforts over the years to achieve terrorist ends, and his complete lack of recognition or remorse, highlight the likelihood of recidivism and need for incapacitation in his case.

Mehanna's persistent efforts over time to support terrorists, even in the face of scrutiny, underscores the likelihood that he will reoffend if given the chance. He viewed the time he spent in Yemen searching for a terrorist training camp as "the best two weeks of my life. . . . For once . . . I'm not sitting on my butt being a manfiq [hypocrite] telling people to do something I'm not doing." "I don't regret doing this thing at all." [Trial Exhibits 458 & 459]. It is therefore not surprising that when Mehanna returned from Yemen and learned that he was under investigation by the FBI, he was not deterred from his mission. Instead, in April 2006, he and Abousamra discussed trying to reach out again to the leader of the terrorist organization *Lashkar e Tayyiba* ("LeT") for assistance in fighting jihad. [Trial Exhibit 592]("I'd rather not unless something is relatively certain, it's not worth it."). Similarly, he encouraged Abousamra to try to re-connect with Abdulmajid in Pakistan (who, in 2002, had promised to help Abousamra get into Afghanistan to fight). [Trial Exhibit 583]. And when Daniel Maldonado called Mehanna from Somalia in late 2006, Mehanna asked many detailed questions that showed a real interest in getting to Somalia to fight jihad, including how to get there, what airline to use, what to say, whether he needed a visa, and so on.[2] [Trial Exhibits 301 and 303].

---

[2] It is strong evidence of what those closest to Mehanna knew about his desires, motives and objectives that, of all the people on the planet who Maldonado could have called to join him in fighting, he called Mehanna and only Mehanna. It is also indicative of Maldonado and Hammami's belief that Mehanna was capable of influencing others, in that he called Mehanna to ask him to come and to bring other co-conspirators, Abousamra and Spaulding. [*See* Trial Exhibit 300].

Mehanna failed to join Maldonado and Hammami in Somalia, not because he was no longer interested in jihad, but rather because, as Maldonado testified, the opportunity to do so was cut off shortly after Mehanna's telephone call with Maldonado.

Even now, as Mehanna sits in detention following his conviction at trial, he is doing his best to undermine the government's fight against terrorism. For example, he has written on his blog that an unnamed individual had solicited him to engage in terrorist acts. [*See* Attachment "E" (February 25, 2012 Facebook posting)]. Believing, erroneously, that this individual was a government informant, he published his blog post in an apparent effort to expose the informant (and thus render him useless). But when Mehanna was informed that the individual is not a government informant and might well be a genuine terrorist bent on harming returning U.S. servicemen, Mehanna refused to provide any more information about the person. Even now, he is willing to speak out in efforts to undermine the fight against terrorism, but not to advance it. [*See, e.g.,* Trial Exhibit 255A (The Ruling on Killing Oneself to Protect Information)].

Mehanna has demonstrated again and again that nothing short of lengthy incarceration followed by long-term supervised release will deter him from committing acts of terrorism. He deceived his community by concealing his criminal activities and ignored the repeated attempts by his family to discourage his continued violent extremism. Instead of seizing multiple opportunities to explain his actions or to cooperate, he has spread misinformation and has discouraged cooperation. Unlike many of his co-conspirators, who abandoned their criminal enterprise when confronted by family pressure or law enforcement questioning, Mehanna simply took greater pains to conceal his activities, using code words and encryption and changing the tenor of his on-line postings. Mehanna has demonstrated that he does not curtail his activity in the face of law enforcement scrutiny, nor in the face of the arrests and convictions of his co-conspirators and in fact he is willing to go to prison,

or even to die, to achieve his goals.  [*See, e.g.*, Exhibits 777A and 778A].

There is no evidence, moreover, that Mehanna's prosecution and conviction have in any way undermined his resolve to achieve his deadly ends.  On the contrary, it appears that he prefers to be seen as a martyr.  He has consistently attempted to characterize himself as a victim of government excess and a symbol of First Amendment rights.  He continues to falsely claim that the FBI threatened to prosecute him if he did not cooperate with them, and he announced publicly after the trial, "I am 100% free of something that imprisons millions of hearts around the world:  fear of the U.S. government."  [*See* Attachment "D" p. 4 (January 9, 2012 blog post )].  Mehanna's letter to the Court filed on April 9, 2012 tellingly highlights how inconvenienced he feels by the actions of the FBI.  [Dkt. 428-2].  More troubling is his absence of contrition and his self-perception of martyrdom.  He is a defiant individual who now appears eager to cultivate a new identity as a symbol of defiance.  It is the identity of his imprisoned or killed *mujahideen* heroes whom he hopes to emulate.  Just as he once dramatically refused to stand for the Court, it appears that he continues to have no respect for American law and would reoffend if given the chance.  A lengthy prison sentence and period of supervised release is needed to ensure that he does not get that opportunity.

**D.**     **The Need for General deterrence .**  There is a greater value in using this case to achieve the ends of general deterrence than in terrorism cases involving isolated or short-lived activities.  That is because Mehanna's actions are the kind that most individuals who are radicalized in America are likely to contemplate replicating – traveling overseas to get terrorism experience, and using the internet to connect with and support other terrorists.  Moreover, he engaged in these actions before the government had learned of most of them.  Mehanna's efforts in these areas influenced both local youth and others who came to know him through his internet activity.  The length of his prison sentence will therefore send an important message about the seriousness with which his type of

criminal conduct is regarded by our Courts.

Mehanna's efforts to radicalize and recruit others by publishing *al Qa'ida* branded recruitment materials with the requisite criminal intent, represents a type of terrorist activity that is less spectacular than an explosion or hijacking but no less dangerous, and perhaps more influential. In the modern era, *al Qa'ida* and some affiliated groups have devoted more resources on inspiring would-be terrorists inside the United States to radicalize and carry out operations on their own.[3] Anwar al Awlaki, Abu Muhammad al-Maqdisi, Ali Al-Timmimi are all examples of Mehanna's icons who have been pursued, imprisoned and/or killed for encouraging and inciting terrorist activities. Their impact has been far-reaching, not the least on Mehanna. Mehanna, after all, also sought terrorist training and conspired and attempted to kill American soldiers. Punishing Mehanna with a substantial prison sentence will deter such behavior and will highlight that recruitment efforts are criminal if they are intended to be done in coordination with *al Qa'ida*.

Mehanna is a rare individual who both attempted to engage in violent actions himself and also worked to recruit others to do so.

### III. Sentencing Recommendation

According to the calculations in the Pre-Sentence Report ("PSR"), Mehanna's Total Offense Level ("TOL") is 53[4] and his Criminal History Category is VI, yielding a sentencing range of life

---

[3] *Al Qa'ida* in the Arabian Peninsula has called for the freeing of Mehanna in several of their Inspire Magazine issues. Notably, in the October 2010 issue, Inspire Magazine's editor, Samir Khan, who looked up to Mehanna, explained that the reason he fled for Yemen was Mehanna's arrest. [Attachment "F"(excerpt of October 2010 Inspire Magazine)]. Khan was killed with Awlaki in 2011.

[4] While irrelevant to the TOL which must be capped at 43, the government asserts that a 2-level enhancement is appropriate pursuant to U.S.S.G. §3B1.3 because the defendant utilized special skills not possessed by members of the general public. *See, e.g., United States v. Abonce-Barrera*, 257 F.3d 959, 965 (9th Cir. 2001)(finding Spanish translation and transcription to be expert testimony pursuant to Rule 702); *United States v. Briscoe*, 896 F.2d 1476, 1486 (7th Cir. 1990)(Nigerian). The defendant used his language and digital editing skills for the criminal purpose of translating and editing media for, and on behalf of *al Qa'ida* in furtherance of the crimes of conviction in Counts One and Two. *See, e.g.,* Fed. R. Evid. 702*; United States v. Campa,* 529 F.3d 980, 1017 (11th Cir. 2008)(explaining

imprisonment. The sentencing range is driven in part by the terrorism enhancement, USSG. §3A1.4, which adds 12 levels to what would otherwise be an offense level of 41 and boosts Mehanna's Criminal History Category from I to VI.[5] Without the terrorism enhancement, Mehanna's sentencing range would be 320-405 months. Pursuant to 18 USC §3583(j) and USSG §5D1.2(b)(1)), the maximum term of supervised release is also life.

Appellate courts have consistently criticized extreme variances from the Guidelines in terrorism cases, and they have discouraged sentencing judges from using prior cases as benchmarks for calculating variances. *See, e.g., Jayyousi*, 657 F.3d at 1117 (holding that 17-year sentence was substantively unreasonable)*; United States v. Ressam,* 2012 WL 762986 (9th Cir. 2012) (holding that 22-year sentence was substantively unreasonable in face of 65-to-life Guidelines range*); United States v. Abu Ali,* 528 F.3d 210, 258–65 (4th Cir.2008) (holding that 30–year sentence was substantively unreasonable, because of recidivism concerns and impermissible comparisons to other terrorism-related cases), *resentencing aff'd*, 410 F. App'x 673, 682 (4th Cir.2011) (*per curiam*)(affirming the district court's imposition of a life sentence). In the above-cited cases, as in many terrorism cases, the defendants were ultimately unsuccessful in achieving the underlying goals

---

that the enhancement should apply when legitimate special skills are used to facilitate the crime)*; United States v. Petersen* , 98 F.3d 502, 506 (9th Cir. 1996)(finding computer skills to warrant Section 3B1.3 enhancement); *C.f. United States v. Elefant*, 999 F.2d 674, 678 (2nd Cir. 1993)(assuming translation is a special skill, but finding in that case that it was not used to facilitate the offense).

5      In response to the defense claim of double-counting, the enhancement under Section 3A.14 does not "double count" and is not redundant with the guidelines for provision of material support to terrorists. *See United States v. Meskini*, 319 F.3d 88, 91-92 (2nd Cir. 2003); *United States v. Hammoud,* 381 F.3d 316, 356 (4th Cir. 2004) (en banc), vacated on other grounds, 543 U.S. 1097 (2005). As an initial matter, applicable guideline provisions must be applied unless they are specifically prohibited, and no such prohibition exists in this case. *See United States v. Williams*, 954 F.2d 204, 207 (4th Cir. 1992); *United States v. Perez*, 366 F.3d 1178, 1183 n.6 (11th Cir. 2004) . In addition, the guideline provision under 3A1.4 requires at least one element which is not required for convictions under Counts one through four. For 3A1.4 to apply, the conduct must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct", which is not required of the crimes of conviction. Accordingly, there is no obstacle to applying Section 3A1.4 in this case.

of their respective conspiracies.

Although the sentencing guidelines clearly apply to inchoate offenses as well as terrorist attacks, the terrorism-related guidelines do not distinguish among the many types of conduct that can constitute terrorism offenses. *Id.*  Mehanna achieved many of his unlawful objectives and did harm that will likely last well into the future, but, for reasons beyond his control, he did not succeed in all of his objectives, including killing Americans.  Terrorism cases are particularly ill-suited to comparison with other cases, because it is difficult to compare the complexity of the various circumstances, especially amidst varying fidelity to the importance of the guidelines.  Moreover, this is the first application of Section 3A1.4 in the circuit, and there ought to be some significance to its weight, even when considering a variance.

Under all of the circumstances of this case, the government believes that a sentence of 25 years' imprisonment, followed by a term of supervised release for as long as Mehanna remains in the United States is appropriate, to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553.

        Respectfully submitted,

        CARMEN M. ORTIZ
        United States Attorney

By:   /s/ Aloke S. Chakravarty
      ALOKE S. CHAKRAVARTY
      Assistant U.S. Attorney

      /s/ Jeffrey Auerhahn
      JEFFREY AUERHAHN
      Assistant U.S. Attorney

      /s/ Jeffrey Groharing
      JEFFREY GROHARING
      Trial Attorney
      Counterterrorism Section

Date: April 10, 2012